**No. 26-30003**

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

*v.*

GARY HAYNES,
*Defendant-Appellant*

*On Appeal from the United States District Court for the Western District of Louisiana*
*No. 6:24-CR-206 (Hon. David C. Joseph)*

## BRIEF OF DEFENDANT-APPELLANT GARY HAYNES

LISA S. BLATT
AMY MASON SAHARIA
*Counsel of Record*
PATRICK J. LOOBY
PATRICK C. HYNDS
ALEXANDRA NICKERSON
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

# CERTIFICATE OF INTERESTED PERSONS

## Case No. 26-30003

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Defendant-Appellant:**

- Gary Haynes

**Plaintiff-Appellee:**

- United States of America

**Counsel for Defendant-Appellant:**

- Lisa S. Blatt
  Amy Mason Saharia
  Patrick J. Looby
  Patrick C. Hynds
  Alexandra Nickerson
  Williams & Connolly LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com
  asaharia@wc.com
  plooby@wc.com
  phynds@wc.com
  anickerson@wc.com

- Todd S. Clemons
  Micah Clemons
  Samuel L. Fowlkes

Todd Clemons & Associates, APLC
1740 Ryan Street
Lake Charles, LA 70601
(337) 477-0000
todd@toddclemons.com
micah@toddclemons.com
sam@toddclemons.com

- Adam P. Johnson
  The Johnson Firm
  1419 Ryan Street
  Lake Charles, LA 70601
  (337) 427-8961
  adam@johnsonfirmla.com

**Counsel for Plaintiff-Appellee:**

- Celia Choy, Trial Attorney
  U.S. Department of Justice, Criminal Division, Appellate Section
  950 Pennsylvania Avenue N.W., Room 1245
  Washington, DC 20530
  (202) 875-1557
  celia.choy@usdoj.gov

- Camille Ann Domingue, Assistant U.S. Attorney
  U.S. Attorney's Office
  Western District of Louisiana
  800 Lafayette Street, Suite 2200
  Lafayette, LA 70501
  (337) 262-6618
  Camille.Domingue@usdoj.gov

- Steven I. Loew, Trial Attorney
  U.S. Department of Justice, Criminal Division, Public Integrity Section
  1301 New York Avenue N.W.
  Washington, DC 20005

- John Luke Walker, Assistant U.S. Attorney
  John W. Nickel, Assistant U.S. Attorney
  U.S. Attorney's Office
  Western District of Louisiana
  800 Lafayette Street, Suite 2200
  Lafayette, LA 70501

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA
*Attorney of Record for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant requests oral argument pursuant to Fifth Circuit Rule 28.2.3. This case presents significant evidentiary errors on a complicated factual record following a nine-day trial. Oral argument will assist the Court in resolving the complex issues the appeal presents.

## TABLE OF CONTENTS

Page

STATEMENT OF JURISDICTION ..... 1

STATEMENT OF THE ISSUES ..... 1

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 4

A. Factual Background ..... 4

B. Procedural History ..... 12

SUMMARY OF ARGUMENT ..... 21

STANDARD OF REVIEW ..... 24

ARGUMENT ..... 25

I. The Court Abused Its Discretion in Permitting Testimony and Argument That Haynes Knowingly Joined the Uncharged LDWF Bribery Conspiracy Under Rule 404(b). ..... 25

A. The Government Failed To Establish That Haynes Knowingly Joined the LDWF Conspiracy. ..... 26

B. The LDWF Evidence Was Not Relevant to Haynes' Intent To Commit the Charged Crimes. ..... 30

C. The LDWF Evidence Was Substantially More Prejudicial than Probative. ..... 36

D. The Error Was Not Harmless. ..... 39

II. The Court Abused Its Discretion in Admitting Prejudicial Testimony About an Additional Prior Bribery Scheme. ..... 41

A. The Evidence Fails the Rule 403 Analysis. ..... 43

B. The Error Was Not Harmless. ..... 46

III. The Court Abused Its Discretion in Excluding Supplemental Portions of Audio Recordings Necessary for Completeness Under Rule 106. ..... 48

A. GX001-009 ..... 50

B. GX001-015 ..... 54

C. GX005-003 ........ 58
CONCLUSION ........ 63

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Ingram v. United States*, 360 U.S. 672 (1959) .................................................32

*Michelson v. United States*, 335 U.S. 469 (1948) ........................................43, 45

*Old Chief v. United States*, 519 U.S. 172 (1997) ..........................................44, 45

*Snyder v. United States*, 603 U.S. 1 (2024) ......................................................31

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) ..........................*passim*

*United States v. Bell*, 516 F.3d 432 (6th Cir. 2008) ..........................................37

*United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012) ......................................32

*United States v. Burns*, 162 F.3d 840 (5th Cir. 1998) ........................................50

*United States v. Clay*, 667 F.3d 689 (6th Cir. 2012) ...........................................34

*United States v. Cook*, 557 F.2d 1149 (5th Cir. 1977) .......................................43

*United States v. Cui*, 163 F.4th 1072 (7th Cir. 2026) ..........................................31

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) .....................................62

*United States v. Delgado*, 984 F.3d 435 (5th Cir. 2021) .....................................27

*United States v. Dixon*, 185 F.3d 393 (5th Cir. 1999) .........................................24

*United States v. Fortenberry*, 860 F.2d 628 (5th Cir. 1988) ..............................37

*United States v. Fortna*, 796 F.2d 724 (5th Cir. 1986) .......................................34

*United States v. Guerrero*, 650 F.2d 728 (5th Cir. 1981) ................26, 27, 31, 33

*United States v. Gutierrez-Mendez*,
752 F.3d 418 (5th Cir. 2014) ........................................................24, 26, 27, 29

*United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) .................................31

*United States v. Hays*, 872 F.2d 582 (5th Cir. 1989) ..................................46, 48

*United States v. Heard*, 709 F.3d 413 (5th Cir. 2013) .................................33, 34

*United States v. Herman*, 997 F.3d 251 (5th Cir. 2021) ..........................*passim*

*United States v. Houston*, 481 F. App’x 188 (5th Cir. 2012) .......................62, 63

*United States v. Jackson*, 339 F.3d 349 (5th Cir. 2003) ....................................33

Page(s)

Cases—continued:

*United States v. Juarez*, 866 F.3d 622 (5th Cir. 2017)....34, 36, 38
*United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978)....63
*United States v. Lee*, 724 F.3d 968 (7th Cir. 2013)....33
*United States v. Polasek*, 162 F.3d 878 (5th Cir. 1998)....45
*United States v. Repak*, 852 F.3d 230 (3d Cir. 2017)....34
*United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997)....63
*United States v. Ridlehuber*, 11 F.3d 516 (5th Cir. 1993)....25, 29, 38, 39
*United States v. Rivera*, 490 F.2d 447 (5th Cir. 1974)....43
*United States v. Smith*, 804 F.3d 724 (5th Cir. 2015)....33, 36, 38
*United States v. Sumlin*, 489 F.3d 683 (5th Cir. 2007)....25, 26, 39, 46
*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999)....31
*United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000)....35

## STATUTES AND RULES

18 U.S.C.
§ 371....12
§ 666....12, 31, 32
§ 1512....12
§ 1952....12
§ 1956....12
§ 3231....1

28 U.S.C. § 1291....1

Fed. R. Evid.
106....*passim*
403....*passim*
404....*passim*

U.S.S.G. § 3B1.1(c)....21

## OTHER AUTHORITIES

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 5084 (2d ed.) .......... 49

Claire Taylor, *Lafayette ADA Gary Haynes Seeks Dismissal in Bribery Case of Evidence Seized from DA's Office*, ADVOCATE (Aug. 13, 2025) .......... 47

Claire Taylor, *Lafayette ADA Gary Haynes Seeks Dismissal in Bribery Case of Evidence Seized from Federal Bribery, Kickback Charges*, ADVOCATE (Oct. 4, 2024) .......... 47

Leslie Turk, *Facing Up to 60 Years if Convicted, Lafayette Prosecutor Gary Haynes Pleads Not Guilty*, CURRENT (Oct. 4, 2024) .......... 47

Leslie Turk, *Prosecutor Gary Haynes' Federal Bribery Trial Gets Underway*, CURRENT (Sept. 8, 2025) .......... 47

## STATEMENT OF JURISDICTION

The district court (Joseph, J.) had jurisdiction under 18 U.S.C. § 3231. Judgment entered on December 12, 2025. ROA.1126-32. Defendant-Appellant Gary Haynes timely appealed on December 23, 2025. ROA.1133-34. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in admitting, pursuant to Federal Rule of Evidence 404(b), evidence of Haynes' alleged participation in an uncharged bribery scheme.

2. Whether the district court erred in admitting unfairly prejudicial testimony about Haynes' connection to an additional prior bribery scheme at the Lafayette Parish District Attorney's Office.

3. Whether the district court erred in denying Haynes' motion to supplement, pursuant to Federal Rule of Evidence 106, the government's excerpted audio recordings with clarifying and explanatory portions.

## INTRODUCTION

The government charged Haynes, an Assistant District Attorney in Lafayette Parish, Louisiana, with conspiring with a colleague and a vendor to receive kickbacks on services the vendor provided to the DA's Office. In its investigation, the government recorded many conversations involving the

alleged conspirators over several months, flipped both alleged co-conspirators, and raided the DA's Office. It thus should have had more than sufficient evidence of the alleged quid pro quo.

But, on close inspection, the story the evidence told conflicted with the government's theory of the charged bribery scheme. For starters, Haynes received *no money or anything of value* from the vendor while the vendor and his DA's Office colleague reaped over $800,000 in profits. Rather, Haynes paid hundreds of thousands of dollars *to his co-conspirators* who supposedly needed *Haynes'* official acts for their scheme. After flipping the vendor, the government arranged for the vendor to give Haynes two $10,000 checks—a fraction of what he was owed—which Haynes never cashed. Haynes received no other payments or anything else of value.

The audio recordings supposedly revealing the quid pro quo showed deep confusion among the participants about the purpose of the payments. To fill the gaps, the government was forced to lean heavily on cooperator Dusty Guidry—an admitted serial con-artist who was addicted to drugs at the time of the events, was at the center of a much larger web of criminal activity spanning the State, and was routinely lying to his alleged co-conspirators. The government elected not to call the other cooperator at the eleventh hour

because he and Guidry couldn't agree on basic facts like when the alleged conspiracy began or the terms of the alleged quid pro quo.

The government secured a conviction only by improperly widening the lens. It zoomed out to focus on inflammatory evidence of Haynes' alleged involvement in, or knowledge of, two separate bribery schemes—one involving his alleged co-conspirators, and another from over a decade earlier involving his wife. The district court permitted evidence of the first uncharged scheme under Rule 404(b) and evidence of the latter on the condition that the government swap out the word "wife" for someone "close" to Haynes.

Both rulings were erroneous. The result was devastating. Haynes was forced to defend against double the bribery allegations and against the unfair insinuation that he, a dedicated public servant with no criminal history, was a serial criminal who associated with other criminals.

Making matters worse, the court denied significant portions of Haynes' mid-trial motion under Rule 106 to supplement incomplete snippets of audio recordings admitted in the government's case. The government introduced just shy of fifty clipped recordings that were shorn from context and played out of order. The additional portions that Haynes offered corrected

misimpressions going to the heart of his defenses to both the charged and uncharged bribery schemes.

The prejudice from these errors permeated the trial. The court's pretrial rulings on the uncharged conduct dramatically altered the case's trajectory, transforming what should have been a straightforward bribery trial into a referendum on Haynes' character. This Court should vacate Haynes' convictions and remand for a new trial limited to admissible evidence.

## STATEMENT OF THE CASE

### A. Factual Background

1. This case centers on the pre-trial intervention (PTI) program administered by the Lafayette Parish District Attorney's Office (DA's Office). PTI is an alternative to prosecution that results in dismissal of charges for enrolled defendants. ROA.1447, 2024-25. Participants agree to a period of supervision and to complete educational programming, often a mix of in-person and virtual courses. ROA.1447. In Louisiana, PTI enrollment criteria are entirely within the discretion of the elected DA. ROA.1527-28, 1921-22.

PTI presents a win-win for defendants and prosecutors. Defendants have a chance at rehabilitation and to avoid a conviction; the DA's Office relieves the strain on its overcrowded dockets and makes substantial revenue. ROA.1522. Participants pay an enrollment fee—up to $1,000, depending on

the offense—and a supervision fee to the DA's Office and pay fees to vendors providing the courses. ROA.1449-50, 1584-86. The DA's Office has "revenue-sharing" arrangements with certain vendors whereby the vendors remit a portion of their fees to the DA's Office. ROA.1561, 1605-06.

In January 2021, Don Landry was inaugurated as the new Lafayette Parish District Attorney. ROA.1431. Having inherited a backlog of cases due to the COVID pandemic, ROA.2019, Landry determined to increase PTI enrollment, ROA.1522, 2735. Landry furthered this goal by, among other things, loosening enrollment criteria, shortening the supervision period, and approving early certification for defendants who promptly completed their coursework. ROA.2798-99. For example, Landry approved enrolling second-time DUI defendants who had historically been ineligible. ROA.1596, 1932-33, 2798.

Landry hired Haynes and Dusty Guidry to oversee the program. Haynes, a city prosecutor whom Landry hired as a part-time Assistant District Attorney, did not have deep experience with PTI and had no experience with felony cases that the Office handled. ROA.1452-53, 1964. Guidry, a non-lawyer hired as a consultant, was the PTI "guru" whom Landry brought on to

"revamp the PTI program" based on his decades of work administering similar programs in other parishes. ROA.1454, 1472-73, 1654, 2018-20.

As the government acknowledged below, however, Guidry was a serial "schemer," ROA.1425 (government opening), and "very good con man," ROA.1780 (case agent testimony). By the time Guidry started in Lafayette, he had arrangements with several PTI vendors (including all those already serving the Lafayette PTI program) whereby the vendors paid him a portion of their revenue. ROA.2078, 2175-77. Guidry brought these kickback arrangements with him to the Lafayette DA's Office. ROA.2034, 2177. He had similar arrangements with PTI vendors in about half the parishes in Louisiana. ROA.2162.

Landry told Guidry that Guidry had "full authority" over the Lafayette program and could do "whatever he wants." ROA.1935. Guidry enthusiastically exercised that authority. At the meeting in which Landry announced his PTI priorities, Guidry did most of the talking. ROA.2624. Guidry assigned required courses, ROA.1554, and exercised day-to-day oversight of cases, *e.g.*, ROA.1894-95, 1954-55, 2659, 3616. Guidry also took measures to increase enrollment such as holding "group enrollments" instead of individual meetings. ROA.1887-88, 1937-38, 2057. He worked daily with

PTI staff to review casefiles for potential enrollees, encouraging them to see "what we could do to help to get them moving quickly." ROA.1910.

Guidry was a constant presence in the DA's Office. He worked long hours—often arriving at 7:30 AM—supervising PTI staff who considered him their superior. *E.g.*, ROA.1881, 1904, 1916. Guidry shared an office with the lead PTI coordinator, Zoila Perez, and directly supervised her work. ROA.1881, 1904. Perez described Guidry as a "braggadocious" and "aggressive" coworker who "put a lot of pressure on people." ROA.1956-57.

Haynes, who still worked as a city prosecutor, was less present. ROA.2053. The PTI enrollment process operated without Haynes' direct involvement for most cases. ADAs would refer cases directly to PTI staff who would process the referral. ROA.2530, 2632-34, 2653-55. Occasionally, Haynes would weigh in on cases at Guidry's request. *E.g.*, ROA.3642. When Haynes was uncertain about a case, he sought Landry's input. *E.g.*, ROA.2558. Guidry thought that Haynes' reviews in these instances moved too slowly. ROA.2052-53.

Guidry also was frustrated that Haynes denied enrollment too often, including in cases involving three defense attorneys focused on DUI cases with whom Haynes had an adversarial relationship stemming from his work as a

city prosecutor. ROA.2059, 3266 (DX16). As a work around, in November 2021, Landry and Guidry cut Haynes out of the intake process for cases involving these attorneys. ROA.1469-70, 1922-24, 1940, 2059. Unbeknownst to Haynes, Landry and Guidry met with the attorneys at one of the attorney's offices to establish a process in which Guidry was empowered to pre-approve cases and to deal directly with the attorneys. ROA.1935-36, 2060-61, 2218-21.

2. The government first learned of Guidry's malfeasance when a PTI participant complained that a PTI vendor had attempted to extort him. ROA.1645-46. Through a wiretap of that vendor's phone (and later Guidry's), the government learned that Guidry was involved in these "shake downs." ROA.1979-80, 2045-46. (Haynes heard about this incident and reported it to Landry. ROA.1619, 2884-85.)

The government intercepted calls between Guidry and a man named Leonard Franques with whom Guidry had one of his personal "revenue-sharing" arrangements. *E.g.*, ROA.3519 (GX201-003). Franques was a prominent local businessman who recently had invested in a business offering online cognitive behavioral therapy (CBT) courses eligible for the PTI program. ROA.1651-52, 2048-49. Guidry had used Franques as a PTI vendor for programs in other parishes. *See* ROA.2033-34, 2177. Landry, who knew of

Franques' good reputation, approved him as a Lafayette PTI vendor. ROA.1460-61. As relevant here, Franques and Guidry also were developing courses for use by the Louisiana Department of Wildlife and Fisheries (LDWF) and investing together in a separate business involving credit-card processing services called GPP. ROA.1689-91, 1770-71.

Guidry's intercepted calls with Franques suggested that Haynes had agreed to go into business with Guidry and Franques. Between May and August 2021, Haynes invested $219,000 in personal checks to one of Franques' companies and Guidry. ROA.3263 (DX2), 3264 (DX4), 3635-37 (GX19), 3633 (GX20). The purpose of Haynes' investment was the central dispute at trial. The government characterized the $219,000 as a "buy-in" to the PTI bribery scheme; Haynes argued it was meant as an investment in business ventures separate from the Lafayette PTI program.[1]

The nature of the relationship between Haynes, on the one hand, and Guidry and Franques, on the other, remained vague based on the intercepted calls through early December 2021. In calls between Guidry and Franques, the two discussed the prospect of repaying Haynes through financing a car

[1] Unbeknownst to Haynes, Guidry had taken the funds that Haynes paid to Franques' company for Guidry's own use. ROA.3519 (GX002-001).

lease. *E.g.*, ROA.3519 (GX001-015). But the two spoke negatively about Haynes' work ethic and usefulness to their effort to grow the PTI business. In a series of September 2021 calls, Guidry expressed a desire to "get [Haynes] out of our hair," ROA.3519 (GX242-001), and complained that Haynes "doesn't add nothing to us," ROA.3519 (GX243-001). In the few calls between Guidry and Haynes, the two discussed PTI cases, *e.g.*, ROA.3519 (GX2007-001, GX215-003, GX217-003), and, on one occasion, the prospect of a car lease, ROA.3519 (GX213-001). On these calls, Haynes never linked his initial investment or expectation of repayment with action on the PTI program.

Franques' investment in the CBT courses had broken even by August 2021, ROA.2810-11, and he and Guidry were making a "ton" of money, ROA.2269-70. But neither had paid Haynes a cent. Franques' business records showed an intended 50/50 split between Guidry and Franques for revenue from the CBT course fees. ROA.3340 (DX22). No documents showed Haynes receiving a portion. ROA.2958-59.

The government then escalated its investigation. On December 8, FBI agents confronted Franques and his wife Michelle, who worked for Franques' businesses, at their home; both immediately agreed to cooperate. ROA.1673-74. The government learned that Guidry was addicted to opioids and, on

December 10, facilitated his arrest by state police during which over 100 pills were discovered in his car. ROA.1785-87, 2095. Landry suspended Guidry but reinstated him two months later while his charges were still pending; on Landry's instructions, Guidry continued to advise on PTI cases while suspended. ROA.1949, 3266.

Franques agreed to record a series of conversations with Haynes. The FBI coached Franques to create a link between Haynes' expected return on his prior investments with revenue from Franques' CBT courses offered through the Lafayette PTI program. ROA.1826-27, 2407-08. The government arranged for Franques to give Haynes two $10,000 checks in January and February 2022. ROA.1827-30. Haynes never cashed or negotiated the checks. ROA.1740, 1830-31, 2427.

Several recorded meetings between Haynes and Franques from December 2021 to February 2022 were admitted at trial. *E.g.*, ROA.3519 (GX002-001). On them, Haynes expressed concern that his and/or Guidry's phones were being tapped, *e.g.*, ROA.3519 (GX002-001), and suggested that Franques delete his texts with Guidry, ROA.3519 (GX003-007). When discussing Haynes' repayment, the group (Haynes, Franques, and Guidry) mentioned the potential car lease. *E.g.*, ROA.3519 (GX001-015). Guidry

justified the delay in repayment by repeating the lie that he and Franques had insufficient funds to repay Haynes. ROA.3519 (GX001-013). In one meeting, Franques, acting on the government's coaching, ROA.1818, volunteered his view what they were doing was "not legal," to which Haynes can be observed signaling apparent, uneasy agreement, ROA.3519 (GX001-017).

The investigation went dormant from February until May 2022, when the government executed a search warrant at the DA's Office. ROA.1789. When Haynes was charged, he had not received a car or anything else funded by the alleged PTI program "kickbacks," and he had not cashed the two government-funded $10,000 checks. ROA.1740, 1780, 2427, 2953.

### B. Procedural History

1. In September 2024, a grand jury returned an indictment charging Haynes with one count of conspiracy to engage in bribery (18 U.S.C. § 371); one count of bribery (18 U.S.C. § 666(a)(1)(B)); two counts of use of a facility in interstate commerce in aid of bribery (18 U.S.C. § 1952(a)(3)); one count of conspiracy to commit money laundering (18 U.S.C. § 1956(h)); and one count of obstruction of justice (18 U.S.C. § 1512(b)(2)(B)). ROA.30-38. The bribery-related allegations centered on an alleged quid pro quo conspiracy whereby, in or around January 2021, Haynes agreed to exchange official action at the

DA's Office in exchange for kickback payments from Guidry and Franques from the PTI course fees. ROA.32-35, 1420-21. The money laundering allegations concerned the concealment of the alleged kickback payments, with a focus on Haynes' revival of a defunct company—MD at Law LLC—as an act allegedly in furtherance of the conspiracy. ROA.1421. The obstruction of justice charge focused on Haynes' suggestion that Franques delete his text messages with Guidry. ROA.1421.

Guidry and Franques pled guilty to charges covering a broader range of conduct and agreed to testify against Haynes. Guidry's plea covered his kickback arrangements with four Lafayette PTI program vendors—*i.e.*, Franques plus three others—through which he earned over $800,000. ROA.3686-705 (GX43). This was just a small slice of the kickback deals he had struck across the State. *Supra* p.6. Guidry's plea stipulated that he was a "public official" at the DA's Office and that he received kickbacks in exchange for his official acts. ROA.3697. Guidry also pled guilty to a separate bribery conspiracy involving himself, Franques, and an LDWF official named Jack Montoucet involving kickbacks from online course fees. ROA.3702-04. Franques pled guilty to only the LDWF scheme, although his plea's stipulated facts covered the PTI program. ROA.3662-85 (GX44). Neither the charging

documents nor the stipulated facts in either cooperator's case suggested that Haynes was part of the LDWF scheme. *See* ROA.3686-727 (GX43), 3662-85 (GX44).

But, in advance of Haynes' trial, the government disclosed that it would argue that Haynes also was a member of the separate LDWF conspiracy, which it claimed was intrinsic to the charged conduct or, if extrinsic, was admissible under Rule 404(b) as relevant to intent. ROA.127, 129-34, 306-13. Haynes moved to exclude under Rule 404(a). ROA.201-12. The district court agreed with Haynes that the separate LDWF scheme was extrinsic evidence but ruled that Haynes' alleged participation (or attempted participation) in it was probative of Haynes' "intent in engaging in the charged conduct to receive financial benefit." ROA.333-35.

Before trial, Haynes also moved to exclude evidence that his wife had been convicted of bribery in 2012 stemming from conduct when she was an office assistant at the DA's Office. ROA.212-14. The government argued that evidence of her conviction—specifically, that it occurred after an investigation involving wiretaps—was necessary to establish Haynes' knowledge that wiretaps are often used in federal criminal investigations. ROA.128-29, 134-35, 313-16. The court issued a compromise ruling permitting the government

to offer the evidence if it did not identify that the person whose conviction Haynes was familiar with was his wife. ROA.335-36.

2. Trial occurred in September 2025 and lasted 9 days. The government's case featured prominently clips from the wiretap and consensual recordings. The government sliced the handful of recorded sessions into around 50 separate clips and played them out of order. Of its cooperators, the government called only Guidry. It informed the defense that it did not intend to call Franques over a weekend, before resting its case on the following Monday. ROA.2396, 2513.

Haynes offered a multi-prong defense to undermine the alleged quid quo pro agreement. He argued that Guidry had encouraged him to invest in Franques' businesses, including GPP, that Haynes intended to be unconnected to the Lafayette PTI program. *See* ROA.1438. Haynes contended that Guidry had deceived him (and Franques) regarding where Haynes' money went and the source of promised returns on his investments. *E.g.*, ROA.1438, 3101, 3112. He also argued that Guidry and Franques were incentivized to implicate him due to their comparatively greater criminal exposure, and that the government's investigation was biased. ROA.3093-95, 3101, 3108-11. Substantial evidence supported these arguments.

*First*, the central paradox of the case was that Haynes had paid $219,000 to his alleged co-conspirators who supposedly needed *his* official acts. ROA.2064, 2196. The government argued that this was a "buy-in" to the PTI bribery scheme, but Guidry agreed that Haynes' investments had been intended for businesses distinct from the courses offered through the PTI program. ROA.2239, 2807-08. Guidry had pitched Franques-adjacent investment opportunities to others, characterizing what the government calls "kickbacks" as legitimate revenue. *See* ROA.2729-30, 2815-16.

*Second*, the evidence of the quid pro quo agreement—which the government claimed was struck in January 2021—was weak and contradictory. That was especially so for evidence obtained before Franques' cooperation in December 2021. Before the government's intervention, the intercepted calls showed that Guidry and Franques did not think that Haynes was contributing to their efforts to grow the PTI-related business and were not planning on cutting him into the profit split. *See supra* p.10. They had little reason to; Guidry had de facto authority of the PTI enrollment process, which occurred largely without Haynes' involvement. *Supra* pp.6-8.

Moreover, substantial evidence indicated that Haynes did not connect his official acts at the DA's Office with any obligations to Guidry or Franques.

For example, Haynes' pace of referring cases to PTI did not increase after his spring 2021 investments. ROA.2236. To the extent that the DA's Office was increasing PTI enrollment, that instruction came from Landry (not Haynes), *see supra* p.5, and Guidry had authority to enroll participants and to steer them to Franques' classes without Haynes, *supra* pp.6-8. Haynes frequently rejected eligible PTI cases well into the alleged conspiracy period, *see supra* pp.7-8, and he resisted policy changes that would have dramatically increased enrollment. For example, he rejected a proposal to open the program to certain drug offenses. ROA.2570-74. And after Guidry's suspension in December 2021 required Haynes to take a more active role in administering PTI, Haynes *rescinded* the policy of admitting second-time DUI defendants that Landry had approved. ROA.1949, 2636, 3266 (DX16).

Critically, the evidence concerning the formation of the alleged bribery agreement was in conflict. Guidry admitted he never spoke with Haynes about bringing him into the PTI kickback scheme; rather, he testified that Franques must have had that conversation. ROA.2049, 2819. But, as the case agent (Agent Herman) admitted, Franques denied having that conversation and the "origin" of the conspiracy "ha[d]n't been made clear." ROA.2931-32.

Because the government did not call Franques, its case turned on Guidry, who the government (and even Guidry himself) conceded was a serial con artist addicted to drugs at the time of the alleged events. *Supra* p.6. Guidry described himself as being at the "center of communication" in the alleged conspiracy, ROA.2050, and Agent Herman testified that Guidry was frequently dishonest with all parties—*i.e.*, that he was "telling one person one thing and another person the other." ROA.2425. On the stand, Guidry struggled to recall key facts and frequently contradicted himself. *See, e.g.*, ROA.2074.

The evidence concerning the government's investigation also showed overreach that a jury could have found damaging to the case's credibility. A defense witness testified that she never mentioned Haynes in her interview with the government but agents nevertheless attempted to steer her interview to implicate Haynes. ROA.2737-38. Additionally, Michelle Franques (Leonard's wife) had provided the government with corrections to an interview memorandum, pointing to several instances where she claimed the government had mischaracterized the substance to wrongly implicate Haynes

to suit the government's narrative. *See* ROA.2945-48.[2] The government's assertions that Haynes had acted improperly in increasing enrollment for PTI generally, or in his decisions on certain cases, fell flat when the evidence established that growing PTI was Landry's priority and that Guidry, not Haynes, was principally responsible for implementing those reforms. *Supra* pp.5-7. For example, after the government attempted to show that Haynes had wrongly permitted a defendant to remain in the program after an additional DUI charge, *see* ROA.1458, it was revealed that Landry made the decision in consultation with Guidry, ROA.1545, 1578, 2205-08. The defense established that Landry had approved multiple other enrollments that he had suggested were improper during his direct examination. *See* ROA.1462, 2382-84, 2725-26, 2954.

Several district court evidentiary rulings affected the trial.

First, pursuant to the court's pre-trial ruling, the government focused heavily on the LDWF evidence. Agent Herman testified that it was a "hot and

[2] Michelle, whom the government determined was culpable but did not charge, ROA.2887, invoked her Fifth Amendment privilege to avoid testifying, ROA.2778-79. The court denied Haynes' motion to admit her memorandum corrections but permitted the defense to explore the topic on cross-examination of the case agent, agreeing that the evidence was relevant to Haynes' bias defense. ROA.2771.

heavy" "corruption scheme," that was "different" from the charged bribery scheme. ROA.1675, 1689-91. Guidry testified that he pled guilty to it, and that it was "20 times bigger" than the charged PTI scheme. ROA.2034, 2037, 3702-04. Guidry also testified, often in response to leading questions, that Haynes joined the scheme, ROA.2036, yet he also agreed that Haynes "didn't provide any relevance to" it, ROA.2071.

Second, also pursuant to the court's pretrial ruling, the government elicited testimony from Agent Herman and PTI staffer Perez that Haynes was close with *someone* who had been convicted of bribery a decade earlier involving supposedly similar facts. *E.g.*, ROA.1723-24, 1879. This included testimony that Haynes was present in the courtroom when that person was sentenced. ROA.1723-24.

Finally, the court denied in part Haynes' mid-trial motion to play additional portions of certain audio recordings under Rule 106. ROA.2091-93, 2230-31.

3. The jury convicted Haynes of all six counts. ROA.1284-85. The court later denied Haynes' motion for a new trial. ROA.1108-23.

Guidry and Franques were sentenced in separate proceedings. Guidry (whose stipulated kickback profits exceeded $800,000) received 48 months'

imprisonment, ROA.3733 (sealed), No. 24-cr-206, Dkt. 160 at 2; Franques received 12 months and 1 day's imprisonment, ROA.3733 (sealed), No. 24-cr-206, Dkt. 160 at 2. At Haynes' sentencing, the court rejected the government's argument for a leadership role enhancement under U.S.S.G. § 3B1.1(c). ROA.3145-51. The court calculated Haynes' Guidelines range at 97-120 months, ROA.3165-66, and sentenced him to 84 months' imprisonment, ROA.1128, 3178. Haynes timely appealed. ROA.1133-34.

## SUMMARY OF ARGUMENT

I. The district court erred in admitting evidence of the uncharged bribery scheme involving LDWF. The court's ruling that this evidence was relevant to Haynes' intent under Rule 404(b) was wrong several times over.

First, the government failed to prove that Haynes participated in the separate conspiracy by a preponderance of the evidence, a prerequisite for admission under Rule 404(b). The evidence that Haynes understood that the LDWF business involved bribery came from Guidry, but his testimony was confused and unsupported. Second, because extrinsic conduct is relevant to intent only if the charged and uncharged offenses share a common intent element, Haynes' vastly dissimilar role in the two alleged schemes made the LDWF evidence irrelevant. The court excused this intent mismatch by

focusing on similarities between the two alleged schemes unrelated to Haynes' intent and engaged in forbidden propensity reasoning. Third, the court failed to properly weigh the serious Rule 403 risks. The evidence was unfairly prejudicial, and its admission was not harmless, because it required Haynes to mount double bribery defenses while wrongly painting him as a serial criminal.

II. The district court made a second, fatal error in allowing the government to repeatedly elicit testimony about a bribery scheme at the DA's Office in 2011-2012. The district court overruled Haynes' Rule 403 objection as long as the government did not refer to the marital relationship between Haynes and a convicted defendant in that case.

The elicited testimony had zero probative value and was as prejudicial (if not more so) than if the government had explicitly mentioned Haynes' wife. The government had no need to explore the topic at all. Haynes, an experienced prosecutor, obviously knew about ordinary investigative techniques, and he demonstrated knowledge of federal wiretaps in admitted audio recordings. Instead, the evidence served only an unfairly prejudicial purpose. Testimony that Haynes "knew very well" someone who was prosecuted for bribery and that he was "present" in the courthouse for the "guilty pleas and hearings" suggested that either he or a close family member

was involved in that scheme. The evidence was not harmless because it further, and incorrectly, painted Haynes as someone of low character who associated with criminals.

III. The district court made a final prejudicial error in allowing the government to play excerpts from audio recordings, excluding Haynes' proposed additions to complete the excerpts under Rule 106. Three rulings were erroneous:

In GX001-009, the government's clip suggested that Haynes was motivated to enroll more participants in Franques' CBT courses to receive kickbacks. The excluded portion corrected that misimpression by clarifying that increased CBT course enrollment could potentially benefit the DA's Office through a legitimate revenue-sharing arrangement with the Office.

GX001-015 implied that Franques and Guidry would pay Haynes in exchange for increasing CBT course enrollment. In a later portion of the conversation the court excluded, Haynes clarified that he intended to be reimbursed from other ventures (*i.e.*, those not connected to CBT course fees).

Lastly, GX005-003 suggested that Haynes intended to receive money derived from CBT course fees and that Franques was aware of Haynes' investment in the LDWF business. But in excised portions Haynes stated that

he did not want to receive money associated with the CBT courses, and Franques stated that he had no idea Haynes had invested in LDWF.

These errors left the jury with a distorted view of key facts: the source of money Haynes expected to receive in return for his investments, the reason why Haynes intended to be reimbursed, and the existence of a bribery agreement—or lack thereof—between Haynes, Franques, and Guidry.

## STANDARD OF REVIEW

This Court applies "an abuse-of-discretion standard in reviewing evidentiary rulings, which is heightened when evidence is admitted under Rule 404(b), because evidence in criminal trials must be strictly relevant to the particular offense charged." *United States v. Gutierrez-Mendez*, 752 F.3d 418, 423 (5th Cir. 2014) (cleaned up). Erroneous evidentiary rulings are "subject to harmless error review." *United States v. Herman*, 997 F.3d 251, 262 (5th Cir. 2021). An evidentiary error is not harmless "if, in light of the whole record, the contested evidence" "contribute[d] to the verdict." *United States v. Dixon*, 185 F.3d 393, 398 (5th Cir. 1999).

## ARGUMENT

### I. The Court Abused Its Discretion in Permitting Testimony and Argument That Haynes Knowingly Joined the Uncharged LDWF Bribery Conspiracy Under Rule 404(b).

Haynes' convictions should be vacated because the district court abused its discretion in admitting evidence that Haynes knowingly joined a separate criminal conspiracy involving Franques' and Guidry's business before the LDWF. The thinly substantiated LDWF evidence overwhelmed the trial and unfairly required Haynes to defend against two sets of bribery allegations while distracting the jury from the weaknesses in the case.

"Rule 404(b) is designed to guard against the inherent danger that the admission of 'other acts' evidence might lead a jury to convict a defendant not of the charged offense, but instead of an extrinsic offense." *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007) (citation omitted). That danger "is particularly great where," as here, "the extrinsic activity was not the subject of a conviction." *Id.* (quoting *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir. 1978) (en banc)); *see also United States v. Ridlehuber*, 11 F.3d 516, 521 (5th Cir. 1993). In such cases, "the jury may feel that the defendant should be punished" for the extrinsic acts "even if he is not guilty of the offense charged." *Sumlin*, 489 F.3d at 689 (quoting *Beechum*, 582 F.2d at 914).

Three conditions must be met for extrinsic offense evidence to be admissible under Rule 404(b). *See, e.g.*, *Gutierrez-Mendez*, 752 F.3d at 423-24; *Sumlin*, 489 F.3d at 690-91. First, the government must present "sufficient evidence that the putative bad act actually occurred." *Gutierrez-Mendez*, 752 F.3d at 423; *United States v. Guerrero*, 650 F.2d 728, 733 (5th Cir. 1981). Second, a court must determine whether "the extrinsic offense evidence is relevant to an issue other than the defendant's character"—that is, other than the defendant's propensity to commit crimes. *Beechum*, 582 F.2d at 911; *Gutierrez-Mendez*, 752 F.3d at 423. Third, a court asks the Rule 403 balancing question—*i.e.*, "whether the probative value of the evidence sought to be introduced is substantially outweighed by the danger of unfair prejudice." *Beechum*, 582 F.2d at 913-14 (quotation omitted); *Gutierrez-Mendez*, 752 F.3d at 423-24.

The LDWF evidence should have been excluded because it fails all three steps in the analysis.

### A. The Government Failed To Establish That Haynes Knowingly Joined the LDWF Conspiracy.

The first step in the Rule 404(b) analysis asks whether the defendant in fact participated in the extrinsic conduct. This Court "examines all the evidence in the case and decides whether the jury could reasonably find" that

the defendant committed the alleged extrinsic act "by a preponderance of the evidence." *Gutierrez-Mendez*, 752 F.3d at 424 (citation omitted); *see also Guerrero*, 650 F.2d at 733-34.

The government failed to establish that Haynes engaged in the separate LDWF bribery scheme with criminal intent. No evidence proved that Haynes engaged in substantive bribery with respect to LDWF. Haynes did not offer any bribes to anyone at LDWF in exchange for official action. *See* ROA.2077-78. Guidry and Agent Herman testified that Haynes played no practical role in the scheme. ROA.2071, 2911, 2930.

Nor did the government prove that Haynes engaged in a conspiracy to commit bribery in connection with LDWF—*i.e.*, that he agreed to join a conspiracy with intent to further the underlying bribery object. *United States v. Delgado*, 984 F.3d 435, 450 (5th Cir. 2021). No evidence showed that Haynes ever interacted with his supposed co-conspirator Montoucet. Franques, another supposed co-conspirator, "didn't know anything about" Haynes' alleged involvement in the LDWF scheme, at least until Haynes later told Franques that he had invested in Franques' and Guidry's business with LDWF. ROA.2911-12. But even still, the government presented no evidence that Haynes and Franques ever discussed the substance of the LDWF

scheme, what Haynes' role would be, or the terms under which Haynes would supposedly join.

Instead, the government relied on Guidry's testimony that Haynes overheard a conversation about the LDWF scheme and then asked to receive proceeds from what he understood to be a separate kickback scheme. ROA.2073.[3] This testimony is insufficient to lay a foundation for admission of the LDWF evidence under Rule 404(b) for two reasons.

*First*, the testimony is undermined by far more substantial evidence, including other parts of Guidry's testimony. Guidry agreed that Haynes "didn't provide any relevance to" the LDWF scheme, and there was no evidence that Guidry asked the other co-conspirators if Haynes could join. ROA.2071-73; *see also* ROA.2077-78, 2911. Agent Herman agreed that Haynes "wasn't bringing anything to the table" with regard to Franques' and Guidry's business before LDWF. ROA.2910-11. Guidry did not pay Haynes a portion of the LDWF fees even when funds started flowing. ROA.2191-96. Neither Franques' nor Guidry's plea agreements or plea colloquies mentioned Haynes.

[3] Guidry also testified that Haynes agreed to allow Guidry to route Guidry's proceeds from the LDWF business through Haynes' company, MD at Law LLC. ROA.2073. But in an audio recording played by the government, Haynes explained that Guidry wanted to use MD at Law to route proceeds from a different venture, GPP. ROA.2404, 3519 (GX005-003).

ROA.2920-22, 2926-29. Franques never told the FBI that Haynes was involved with LDWF. ROA.2930, 2941. Admitted audio recordings involving Haynes included mention of LDWF, *e.g.*, ROA.2141-42, 3519 (GX001-005), but none proved the government's theory as opposed to showing Haynes' awareness that Guidry and Franques had business with LDWF and he had invested in it. Finally, there was evidence that Guidry pitched LDWF "buy-ins" to others as legitimate investment opportunities. *Supra* p.16.

This evidence is far more consistent with Haynes' wanting to invest in a legitimate business venture than it is with his agreeing to a bribery conspiracy. Extrinsic evidence that is consistent with a legitimate explanation is not admissible where the government fails to provide sufficient evidence contradicting the legitimate explanation. *Ridlehuber*, 11 F.3d at 520-23. In *Ridlehuber*, the district court admitted extrinsic evidence of the defendant's possession of materials "indicative of the illegal manufacture" of drugs. *Id.* at 523. But those materials also "had legitimate uses" for the defendant's business. *Id.* This Court found that fact "crucial" in determining that the government lacked sufficient evidence that the defendant committed the alleged extrinsic act with the relevant criminal intent. *Id.*; *see also Gutierrez-Mendez*, 752 F.3d at 421-22, 424-26.

*Second*, even if it had been substantiated, Guidry's testimony would establish at most that Haynes passively invested in a business that used bribes. It is unclear if that conduct is even illegal. But even if it were, it would fall well short of what the government argued below—*i.e.*, that Haynes knowingly became (or attempted to become) a member of the LDWF criminal conspiracy. *See* ROA.3122-23 (government closing). Indeed, its arguments before the district court relied on the similarities between the two alleged conspiracies and Haynes' allegedly identical intent to join both. ROA.127, 133-34, 307-13. Because the evidence did not adequately lay the foundation for those arguments, the LDWF evidence should not have been admitted.

### B. The LDWF Evidence Was Not Relevant to Haynes' Intent To Commit the Charged Crimes.

Whether extrinsic evidence is relevant to an issue other than the defendant's character "is a function of its similarity to the offense charged." *Beechum*, 582 F.2d at 911. Similarity exists "when the common characteristic is the significant one for the purpose of the inquiry at hand." *Id.* (quotation omitted). Where, as here, the extrinsic evidence is offered to help prove "the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same

state of mind in the perpetration of both the extrinsic and charged offenses." *Id.*; *see also, e.g.*, *Guerrero*, 650 F.2d at 733.

The government argued that the LDWF evidence was admissible to prove Haynes' intent to engage in the charged PTI scheme. ROA.134, 310. The court agreed. ROA.333-34. On this theory, the government needed to show that the intent required to commit the extrinsic offense, *i.e.*, participation in the LDWF bribery scheme, is the same as the intent required under the charged bribery offenses related to the PTI scheme. It did not.

To establish that Haynes committed bribery, the government needed to show that Haynes "'corruptly' accept[ed] a payment 'intending to be influenced or rewarded' for an official act." *Snyder v. United States*, 603 U.S. 1, 10-11 (2024) (quoting 18 U.S.C. § 666(a)(1)(B)). Specifically, the government must prove "a *quid pro quo*—'a specific intent to give or receive something of value *in exchange* for an official act.'" *United States v. Hamilton*, 46 F.4th 389, 395 (5th Cir. 2022) (quoting *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999)). From Haynes' perspective as the alleged bribe-taker, "the focus of bribery is the 'intent to be influenced in the official act.'" *United States v. Cui*, 163 F.4th 1072, 1083 (7th Cir. 2026) (quoting *Snyder*, 603 U.S. at

12). The intent required to convict a public official under § 666(a)(1)(B) is thus inseparable from his status as a public official.[4]

There is an irreconcilable mismatch between Haynes' alleged state of mind with respect to the two schemes because only the charged PTI scheme required his intent to be influenced or rewarded in an official act. Both the government and the court recognized this mismatch. The government alleged that Haynes was "the official actor" in the PTI scheme but acknowledged he was not "in the LDWF scheme." ROA.308. The court agreed that Haynes "did not have authority over the LDWF scheme like he did the PTI program." ROA.333. Yet both treated this dissimilarity as minor compared to other alleged factual similarities between the two schemes—*i.e.*, that they involved fees for online courses and alleged kickbacks and that Franques and Guidry were engaged in both. ROA.307-11, 333-34, 947-48, 1113, 3123.

But those similarities across the two alleged schemes are irrelevant because they have nothing to do with *Haynes' intent*. The relevant question is whether Haynes "had the same state of mind in the commission" of the two

---

[4] The same is true for a conspiracy to solicit bribes as a public official. Conspiracies require "at least the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678 (1959) (quotation omitted); *accord United States v. Brooks*, 681 F.3d 678, 699 (5th Cir. 2012).

offenses. *Guerrero*, 650 F.2d at 733; *see also United States v. Smith*, 804 F.3d 724, 735-36 (5th Cir. 2015).[5] It is insufficient for the "extrinsic and charged offense" to merely share "a common characteristic." *Beechum*, 582 F.2d at 911. Franques and Guidry may have played similar roles in both alleged schemes, but Haynes did not. In the alleged LDWF conspiracy, Haynes was neither the bribed official nor the party offering the bribes. He played no role at all with respect to the alleged bribes.

Without that "crucial point of concurrence between" Haynes' intent with respect to the two alleged offenses, the district court should have excluded the LDWF evidence. *See Guerrero*, 650 F.2d at 734 (in prosecution of defendant for unlawfully dispensing medications, testimony that defendant prescribed pain killers and a tranquilizer was admitted in error because government did not show defendant dispensed those medications "with unlawful intent"); *United States v. Lee*, 724 F.3d 968, 975, 980 (7th Cir. 2013) (in prosecution for possession and conspiracy to possess cocaine *with intent to distribute*,

---

[5] As applied to the conspiracy count, the analysis similarly requires an assessment of whether the underlying substantive offenses "require[d] [the defendant] to indulge himself in the same state of mind and therefore require the same intent." *United States v. Jackson*, 339 F.3d 349, 354-55 (5th Cir. 2003) (quotations omitted); *see also, e.g.*, *United States v. Heard*, 709 F.3d 413, 430 (5th Cir. 2013).

evidence of prior conviction for *possession* of crack cocaine was too dissimilar); *United States v. Clay*, 667 F.3d 689, 693-96 (6th Cir. 2012) (in prosecution for carjacking with intent to cause serious bodily harm, witness testimony that defendant assaulted her when she refused a ride in his car was "too unrelated" and "merely show[ed] … criminal character").

Contrast this case with *United States v. Repak*, 852 F.3d 230 (3d Cir. 2017). In *Repak*, the Third Circuit upheld the admission of uncharged solicitations of bribes to prove the defendant's intent to engage in the charged bribery scheme. *Id.* at 248. The defendant was the executive director of a program receiving federal funds, and both the charged and uncharged solicitations involved the defendant exercising the same official authority over the same contractors providing work for the relevant program. *Id.* at 245-46. Here, by contrast, the LDWF evidence proved nothing about Haynes' intent to be influenced or rewarded in connection with his official duties.[6]

[6] None of the cases the government or district court relied on below is to the contrary. ROA.309-11, 333-34. *United States v. Fortna*, 796 F.2d 724, 736 (5th Cir. 1986), and *Heard*, 709 F.3d at 430, both involved extrinsic conduct *by the defendant* that closely matched the charged conduct and thus was probative of his intent with respect to both. So did *United States v. Juarez*, where the defendant conceded that the offenses shared similar intent. *See* 866 F.3d 622, 627 (5th Cir. 2017).

The government's arguments below and the court's ruling overlooked this mismatch because they conflated intent—an essential element disputed at trial—with motive—a non-element that was not genuinely at issue. The government argued that the LDWF evidence bore on Haynes' "intent to engage in the conspiracy for which he is charged" but, just a sentence later, shifted gears to argue that Haynes' "motive—his greed—is the same in both cases." ROA.309. This argument appeared to persuade the court, which ruled that it was "admissible under Rule 404(b)(2) to prove [Haynes'] intent in engaging in the charged conduct to receive financial benefit." ROA.333. Motive and intent, however, are separate concepts, *e.g.*, Fed. R. Evid. 404(b)(2), and the alleged motive here—"financial benefit"—is common to virtually all economic crimes.

If any extrinsic conduct that seeks profit is admissible under Rule 404(b), then the Rule is effectively toothless in white-collar prosecutions. What is more, the contention that a defendant's previous motivation to make money in some (supposedly) illicit manner sheds light on his intent to commit any crime involving money in the present is nothing more than an improper propensity argument. *See United States v. Varoudakis*, 233 F.3d 113, 120

(1st Cir. 2000) ("financial motive rationale" for admitting extrinsic evidence improper because amounted to forbidden propensity inference).

### C. The LDWF Evidence Was Substantially More Prejudicial than Probative.

The district court incorrectly concluded that the probative value of the LDWF evidence outweighed the danger of unfair prejudice. ROA.334-35. When applying Rule 403 in this context, courts consider "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic evidence and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions." *Smith*, 804 F.3d at 736 (quotation omitted). Courts also assess "the overall prejudicial effect of the extrinsic evidence." *Juarez*, 866 F.3d at 627.

On the first factor, the government used the erroneously admitted LDWF evidence despite its lack of probative value to attempt to prove Haynes' intent to commit the charged offenses. *See infra* p.39. And strikingly, the government did so despite claiming it had no need for the LDWF evidence. In its closing argument, the government told the jury: "You know the amazing thing in this case? Y'all sat and listened to probably 20 different Title III wiretap phone calls where the defendant was describing his participation in criminal activity." ROA.3115. The government went on to say that "[o]ur case

was proved when you listened to the recordings of Gary Haynes. … We convicted him with those recordings." ROA.3127. This factor cuts against the government. *See Beechum*, 582 F.2d at 914 ("[I]f the Government has a strong case on the intent issue, the extrinsic offense may add little and consequently will be excluded more readily."); *United States v. Bell*, 516 F.3d 432, 445-46 (6th Cir. 2008) (noting that "district court should consider the government's alternative sources of proving intent" and concluding that "the government had little, if any, need" for extrinsic evidence).

On the second factor, while Haynes' alleged roles in the two schemes were vastly different, *supra* pp.32-33, the government glossed over that fact in closing to argue the offenses were one in the same: "[I]f … Gary Haynes, this defendant, is going to help conceal the money in his MD at Law account, *he's just as guilty of the conspiracy* as Dusty Guidry. In this case, the Fish and Wildlife scheme *is really exactly like the DA bribery scheme*." ROA.3123 (emphases added). That argument connected the LDWF evidence to the charged PTI offenses, treating Haynes' alleged participation in the LDWF scheme as direct proof of his guilt—not as limited evidence of his state of mind. The government's closing argument "exacerbated the prejudice." *United States v. Fortenberry*, 860 F.2d 628, 634-35 (5th Cir. 1988); *see also Bell*, 516

F.3d at 444 ("When jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact." (quotation omitted)).

On the third factor, while the closeness in time normally would favor the government, here the timing and overlapping personnel cut the other way due to the risk of jury confusion. The similarities on which the government focused did not speak to *Haynes'* intent, *see supra* pp.31-36, yet its equation of the LDWF evidence with evidence of the charged crimes blurred the line between Rule 404(b) limited use evidence and direct evidence of intent.

Finally, the district court's single limiting instruction during the final jury charge—nine days after the government first introduced LDWF evidence—could not alleviate the prejudice. ROA.3055-56. This is not a case where the district court "took several measures intended to allay undue prejudice," such as providing a limiting instruction when the LDWF evidence was first admitted, let alone each time it was admitted. *Juarez*, 866 F.3d at 628-29; *see Smith*, 804 F.3d at 736 (court "repeatedly emphasized" that extrinsic evidence "was to be considered on the issue of Defendant's state of mind or intent" (quotation omitted)); *Ridlehuber*, 11 F.3d at 524 (considering

"circumstances" of extrinsic act evidence, "the trial court's instructions to the jury about the limited use of the extrinsic offense evidence was not sufficient to alleviate any unfair prejudice").

### D. The Error Was Not Harmless.

The admission of the LDWF evidence was not harmless if there is a "reasonable possibility that the improperly admitted evidence contributed to the conviction." *Sumlin*, 489 F.3d at 691 (quotation omitted). Extrinsic evidence of other supposedly criminal offenses is inherently prejudicial. Several factors exacerbated that prejudice and likely affected the verdict.

*First*, the LDWF evidence pervaded the entire trial. *See Ridlehuber*, 11 F.3d at 523-24. The government elicited LDWF-related testimony beginning with its second witness and continued to do so throughout the trial. *E.g.*, ROA.1675, 1689-91, 1694-95, 1705, 2034-38, 2069-78, 2098-99, 2132, 2141-43, 2285-93, 2296-97, 2411-12, 2440, 2448, 2506, 2508, 2729-30, 2844, 2863-66, 2872-73, 2980-82. The government's presentation required a robust response from the defense on cross-examination and in the defense case. *E.g.*, ROA.1760, 1772, 1776-78, 1781-84, 1825, 2177-82, 2191-99, 2233-36, 2239, 2269-70, 2728-29, 2807-08, 2812-16, 2838, 2875-76, 2906-14, 2922, 2926, 2930-31, 2940-41, 2949, 2958, 2996-97, 3013-15, 3026, 3036, 3089-91, 3102, 3112. In effect, the

government opened a new front in the case on the eve of trial and forced Haynes to defend against two separate alleged bribery schemes.

*Second*, the government relied on the evidence in closing. ROA.3074-75, 3122-23. Its arguments blurred the lines between the extrinsic conduct and evidence of the charged offenses in a way that leaned into the Rule 404(a) and 403 concerns.

*Third*, because the LDWF evidence was extrinsic to the charged offenses, the government presented the evidence at a high level of generality. It elicited conclusory testimony from its agents and Guidry about the nature of the alleged scheme and Haynes' purported knowledge of it without delving into details required to prove it beyond a reasonable doubt. For example, Guidry testified that Haynes knew the business involved "kickbacks" based on a one-word answer with no follow up. ROA.2076 ("Q. If you know, did he know you were going to be getting kickbacks? A. Yes."). If the government had the burden to prove Haynes' involvement in the LDWF scheme beyond a reasonable doubt, it is inconceivable that it would have presented the evidence this way. This put the onus on the defense to explain the facts that government glossed over.

*Fourth and finally*, the evidence likely confused the jury and/or risked that the jury would ignore the flaws in the government's case relating to the PTI scheme detailed above. *See supra* pp.4-12. Presented with a complicated picture of that supposed bribery agreement that required piecing together snippets of calls and ignoring glaring inconsistencies, the jury likely was tempted to convict Haynes on the basis that an alleged co-conspirator testified that he was implicated in a separate, more serious ("20 times bigger") scheme. ROA.2037-38. Because this error unfairly undermined the jury's evaluation of Haynes' character, the prejudice infected all counts. The Court should vacate Haynes' convictions and remand.

## II. The Court Abused Its Discretion in Admitting Prejudicial Testimony About an Additional Prior Bribery Scheme.

The district court additionally erred in admitting testimony about the prior criminal investigation of individuals in the DA's Office that resulted in Haynes' wife's criminal conviction. These unfairly prejudicial facts harmed Haynes' defense.

As discussed above, the court issued a compromise ruling on Haynes' motion to exclude evidence relating to his wife's bribery conviction. The government sought to use the evidence in support of its obstruction of justice charge. ROA.313-16. According to the government, if it could show that

Haynes knew about federal public corruption investigations and the use of wiretaps, it could prove that he "acted corruptly" when suggesting Franques delete text messages. ROA.135. The district court held that the fact of Haynes' wife's bribery conviction should be excluded from evidence because jurors might "believ[e] that Defendant is guilty merely by virtue of his wife's conviction," but the government still could introduce evidence about Haynes' closeness to the prior federal investigation "without referencing the Defendant's marital relationship with a defendant in the prior case." ROA.336; *see also* ROA.944.

Consistent with this ruling, the government elicited testimony throughout the trial referencing Haynes' close ties—though not explicitly his marital relationship—to those convicted in the prior case. During its opening, the government stated that ten years earlier, "the FBI investigated the same DA's office for a very similar scheme," and that Haynes "knew the people who got charged, and he knew that it was a federal case, and he knew that the FBI used wiretaps." ROA.1425. Agent Herman testified that "guilty pleas and related hearings" for that case were "held in this courthouse" and "Haynes was present for … those." ROA.1723-24. The government also elicited testimony from PTI staffer Perez that someone "Gary Haynes knew very well

… was later prosecuted for conduct that happened while she was working at the DA's office." ROA.1879-80. And the government had Jessica Broussard, another DA Office employee, testify that she told Haynes that it "look[ed] like the [F]eds" were "going to be back," referring to "what took place over a decade ago," and Haynes simply "smirked, and left." ROA.2306. This evidence should never have been admitted.

### A. The Evidence Fails the Rule 403 Analysis.

Rule 403 provides that even if evidence is "relevant," it may be excluded if its "probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, … or needlessly presenting cumulative evidence." Fed. R. Evid. 403. If evidence is prejudicial and "irrelevant to any issue on trial" or "relevant only in a highly attenuated manner," the prejudice outweighs the minimal probative value, and the evidence should be excluded. *United States v. Rivera*, 490 F.2d 447, 450 (5th Cir. 1974). Similarly, if the evidence is highly prejudicial, such as evidence "strongly suggestive of other wrongs," the prejudice likely outweighs even stronger probative value. *United States v. Cook*, 557 F.2d 1149, 1154 (5th Cir. 1977); *see also Michelson v. United States*, 335 U.S. 469, 475-76 (1948). Probative value is "calculated by comparing evidentiary alternatives" such that the "probative value of an item

of evidence" is "discount[ed]" when the court is "faced with less risky alternative proof going to the same point." *Old Chief v. United States*, 519 U.S. 172, 183 (1997). Here, because the testimony about the prior investigation at the DA's Office had zero marginal probative value and was unfairly prejudicial, it should have been excluded.

As the district court expressly acknowledged, the testimony about the prior investigation was superfluous because Haynes "was undoubtedly already aware of the methods of investigation used by law enforcement from his experience as an [ADA]." ROA.336. And there was ample other evidence in the record demonstrating Haynes' knowledge of federal wiretaps. In multiple audio recordings introduced by the government, Haynes explicitly referenced concern about federal wiretaps. *See, e.g.*, ROA.3519 (GX003-005); ROA.762 (Haynes sharing with Franques that a criminal defense lawyer who works at the federal courthouse told him he thought Haynes' phone was "bugged" and he was "under investigation" by the FBI); ROA.3519 (GX003-009); ROA.770 (mentioning a "long investigation" where people's phones were tapped); ROA.3519 (GX002-001); ROA.580 (discussing caution around phone wiretapping by "the feds").

Given the lack of "marginal probative value" "relative to the other evidence in the case," even slight prejudice would justify exclusion under Rule 403. *Old Chief*, 519 U.S. at 185 (citation omitted). But the prejudice here was significant. The most generous interpretation of the witnesses' statements is that Haynes was very close to someone previously involved in a bribery scheme. Even that is problematic. This Court has recognized that the government cannot attempt to prove guilt by showing that the defendant "associates with unsavory characters" because "guilt by association evidence" is "highly prejudicial." *United States v. Polasek*, 162 F.3d 878, 884-85, 887 (5th Cir. 1998) (quotation omitted). Even when issuing its compromise ruling, the district court seemed to recognize the risks the evidence posed, cautioning the government "this is a big issue; so we need to be very, very careful around it." ROA.944.

An equally available and more prejudicial interpretation is that Haynes *himself* participated in the prior bribery scheme. Agent Herman's testimony that Haynes was present in the courthouse for the hearings and guilty pleas in that prior scheme suggests that Haynes was a defendant, co-conspirator, or somehow involved. Evidence suggestive of a defendant's own prior bad acts is particularly prejudicial. *Michelson*, 335 U.S. at 475-76. Even apart from the

aspersions that this evidence cast on Haynes, the evidence depicted the DA's Office as hopelessly corrupt. This framing likely colored the jury's evaluation of the PTI bribery allegations and encouraged a conviction to punish decades of corruption for which Haynes—who did not join the Office until January 2021—was not responsible.

The outcome of the Rule 403 balancing test here is clear. The court's compromise ruling failed to protect Haynes from unfair prejudice. The district court abused its discretion in permitting testimony about the prior investigation.

**B. The Error Was Not Harmless.**

As previously noted, if there is a "reasonable possibility that th[e] improperly admitted evidence contributed to the conviction," the error is not harmless. *Sumlin*, 489 F.3d at 691-92. "The admission of irrelevant facts that have a prejudicial tendency is fatal to a conviction, even" where there is "sufficient relevant evidence to sustain the verdict." *United States v. Hays*, 872 F.2d 582, 587 (5th Cir. 1989) (quotation omitted).

The admission of irrelevant statements about Haynes' connection to a prior DA's Office bribery scheme likely contributed to his conviction. The jury heard that Haynes was intimately familiar with a similar prior scheme at the

same office involving people close to him. This likely influenced their assessment of Haynes' character and caused them to doubt his defense.

The prejudice from the testimony was likely exacerbated by jurors' preexisting knowledge of the 2011-2012 investigation. Juror 11, for instance, explained during voir dire that he knew about the prior investigation from reading about it in the news and had "thought there was a similar last name" involved. ROA.3188 (sealed), No. 24-cr-206, Dkt. 175 at 37-38.[7] Juror 11 was therefore primed to draw guilt-by-association inferences from the

---

[7] Before trial, multiple news articles referenced Haynes' wife's conviction. *See* Leslie Turk, *Prosecutor Gary Haynes' Federal Bribery Trial Gets Underway*, CURRENT (Sept. 8, 2025), https://thecurrentla.com/2025/prosecutor-gary-haynes-federal-bribery-trial-gets-underway-monday/; Claire Taylor, *Lafayette ADA Gary Haynes Seeks Dismissal in Bribery Case of Evidence Seized from DA's Office*, ADVOCATE (Aug. 13, 2025), https://www.theadvocate.com/acadiana/news/courts/lafayette-ada-charged-with-bribery-wants-evidencetossed/article_665dc39a-c915-4cbf-b386-87f867fa71c5.html. Juror 11 mentioned reading *The Advocate*. ROA.3188 (sealed), No. 24-cr-206, Dkt. 175 at 37-38. One year earlier, around the time of Haynes' not-guilty plea, several articles also made the connection between Haynes and the prior bribery investigation. *See* Leslie Turk, *Facing Up to 60 Years if Convicted, Lafayette Prosecutor Gary Haynes Pleads Not Guilty*, CURRENT (Oct. 4, 2024), https://thecurrentla.com/2024/facing-60-years-if-convicted-lafayette-prosecutor-gary-haynes-pleads-not-guilty/; Claire Taylor, *Lafayette ADA Gary Haynes Pleads Not Guilty to Federal Bribery, Kickback Charges*, ADVOCATE (Oct. 4, 2024), https://www.theadvocate.com/acadiana/news/courts/lafayette-ada-gary-haynes-pleads-not-guilty-to-federal-bribery-kickback-charges/article_82426820-8267-11ef-88fa-57d25de4f1f6.html.

government's evidence. Hearing that Haynes "knew very well" those involved and that he was "present" for the guilty pleas, Juror 11 may have realized that Haynes' wife had been convicted and made the very inference that the district court recognized as forbidden—"believing that Defendant is guilty merely by virtue of his wife's conviction." ROA.336. Or, Juror 11 may have inferred that Haynes himself played a role.

The district court's decision to allow testimony about the prior investigation, making suggestive links to Haynes, impermissibly affected his right to a verdict free of bias. *Hays*, 872 F.2d at 588. This was a textbook example of unfair prejudice substantially outweighing probative value in a way that infected the entire trial. Because this error, like the one concerning the LDWF evidence, unfairly maligned Haynes' character, this Court should vacate Haynes' convictions on all counts and remand.

## III. The Court Abused Its Discretion in Excluding Supplemental Portions of Audio Recordings Necessary for Completeness Under Rule 106.

The government introduced around fifty audio recordings of Haynes' and his alleged co-conspirators' conversations in clips that the government carved out of longer sessions and played out of order. Haynes sought to supplement, under Rule 106, a handful of those clips with additional short

excerpts of the conversations that explained, contextualized, or qualified crucial points in the government's excerpts. *See* ROA.664-77.[8] The district court wrongly excluded three of these requested additions (to GX001-009, GX001-015, and GX005-003, *see* ROA.3519), prejudicing Haynes' defense.

Rule 106 provides that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The addition must simply be relevant and "necessary to qualify, explain, or place into context" the portion already introduced. *Herman*, 997 F.3d at 264 (quotation omitted).

For instance, when one speaker brings up a topic in an initial passage that a second speaker addresses later, this Court has held that the first passage properly places into context the second speaker's treatment of the subject and should be admitted under Rule 106. *See id.* at 266. Further, when a statement in an introduced excerpt "support[s] an inference that the omitted matter refutes," the introduced excerpt leaves a "misleading" impression, Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 5084

---

[8] Haynes' original motion is at ROA.500. At the court's request, Haynes submitted a renewed motion that pinpointed the desired supplemental excerpts in a more readable way. ROA.664.

(2d ed.), and the excluded portion should be admitted in fairness, *Herman*, 997 F.3d at 264-66. By allowing for contemporaneous completion, Rule 106 "guards against the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material." *United States v. Burns*, 162 F.3d 840, 853 (5th Cir. 1998) (quotation omitted).

### A. GX001-009

GX001-009 is a clip of a conversation between Haynes, Franques, and Guidry. In the excerpt, Haynes says that he will tell PTI staffer Perez, "look, Don [Landry] signed a contract with him. He wants to use him. So we need to get these done. We need ah we need ah we need to get, move more cases towards CBT." ROA.700. Haynes sought to introduce an earlier portion of the same conversation where Guidry explains the process they used for determining which PTI classes to assign and Haynes explains that he will tell Perez to use more of Franques' CBT classes because Franques revenue shares with the DA's Office (unlike other vendors, such as Joe Prejean). *See* ROA.669, 698.[9]

[9] Haynes' proposed addition consisted of the following dialogue:

> DG: So so you can't the- the- they just have a hu- and then you have to… So then you babysit 'em and you write protocol. How much time did we

The court excluded this additional portion, reasoning that the rule is "mechanical" and simply "to make sure that" the government is not "cutting a portion … in a way that misconstrues what was being said." ROA.2091. GX001-009 was then admitted and played twice—during Guidry's and Agent Herman's examinations—to support testimony that Haynes was pushing enrollees into Franques' CBT courses to obtain more in kickbacks. ROA.2144-45, 2408.

The court should have admitted Haynes' additional excerpt for at least two reasons. *First*, the proposed addition "place[s] into context" Haynes' mention of placing more PTI participants into Franques' CBT courses. Fed. R. Evid. 106. Guidry had previously brought up the collective goal of shifting

---

> spend figuring out, we must've spent months. Figuring out what classes they gonna do, well why did you put this? Why did you take that out and put Prejean? Why did you take that out and put CBT there? I mean those were your suggestions. We do it.
>
> GH: Yeah.
>
> DG: It's written.
>
> GH: Yeah, and I'm uh and I'm uh talk to Don but I'm uh I'm uh tell Zoila too that, you know, not to cut Joe Prejean out but I'm just gonna say look the CBT classes, they revenue share. The um, the and I know we gotta get there. They don't know all that. All the, all the background on it but Joe doesn't revenue share at all.

ROA.669.

more cases to those courses. Haynes' later comment in the government's excerpt was following up on that point. The earlier excerpt was therefore necessary to understand the basis for Haynes' later statements. *See Herman*, 997 F.3d at 265.

*Second*, Haynes' proposed addition corrects the misimpression left by the government's excerpt about why Haynes was going to "move more cases to CBT." The government's portion alone suggests that Haynes had no reason to prioritize the CBT courses other than to receive illegal "kickbacks." The proposed addition explains, however, that the contract for CBT courses had the potential for legitimate revenue-sharing, which made those courses more attractive to the DA's Office than others, like Prejean's, that did not share revenue.

In *Herman*, this Court held that a similar clarifying excerpt should have been admitted. The government had introduced a statement implying that the defendants kept their money hidden in various locations: Defendants received "$800 a month cash [from gaming machines] that's just … it's whatever you're going to do with that." *Id.* The defendants sought to add another portion of the conversation where someone had stated that "[a]ll our cash deposits go through that bank," refuting the misimpression that the cash from gaming

machines would not be properly stored. *Id.* This Court held that the defendants' addition properly completed the excerpt under Rule 106. *Id.* The district court here likewise should have allowed Haynes to introduce the earlier discussion about legitimate revenue sharing to correct the inference that Haynes was motivated to receive kickbacks arising from the government's excerpt.

Because the excerpt addressed a key aspect of the case (Haynes' reason for enrolling defendants in Franques' CBT courses), its exclusion was not harmless. To prove the charged bribery, the government had to demonstrate that the shift toward the CBT classes was motivated by an illicit quid pro quo. Haynes tried to show that the shift was instead driven by Landry and Guidry, *see supra* pp.16-19, who in part wanted the DA's Office to benefit from revenue sharing with vendors. The role of revenue sharing thus figured prominently at trial, with Haynes emphasizing the importance of revenue sharing with PTI vendors and the government aiming to distinguish the alleged kickback scheme from permissible revenue sharing. *See* ROA.1461-62 (government eliciting from Landry that he never talked to Guidry or Haynes about revenue sharing and that his office did not revenue share); ROA.1560-62 (defense counsel impeaching Landry by showing that his office shared revenue with

some vendors). Haynes' proposed addition would have provided support for his understanding that Landry wanted more CBT participants and that enrolling more defendants in the CBT courses was consistent with Landry's directives and in the DA Office's interest. The court's error thus prejudiced Haynes.

**B. GX001-015**

The government also introduced a portion of a conversation between Franques, Guidry, and Haynes about how Haynes would get reimbursed for his investments in Franques' businesses. In it, Franques urges Haynes to "try and push as many as you can on it[,] right?" ROA.717. Guidry then suggests that he and Franques could repay Haynes through a vehicle or "[s]omething that's not tied to CBT." ROA.718. Franques replies, "I mean that's something that we could do. But you know, that's your call or I can just keep cutting a check to you, whatever, through MD," referring to Haynes' company, MD at Law. *Id.* Haynes responds that he wanted to get reimbursed for his investment first, before receiving other compensation. *Id.*

Haynes sought to complete that excerpt with a subsequent portion of the same conversation. *See* ROA.671-72. There, Haynes tells Franques that he also invested in the separate credit-card processing business (GPP), *see supra*

p.15, and expected some of his reimbursement to come from that venture, ROA.671-72, 719 ("CHS: But you you try nah get the whole 219,000 back … from him? GH: Oh, in ti- in time. [OV] cause but wait see no so- no, no some of it is gonna be coming, he's going to be paying me back [OV] some of it from the other business … Some of it's the investment of GPP.").[10] Guidry then describes three separate business ventures—GPP, LDWF, and the Lafayette PTI business—in a manner suggesting that he thought Haynes was confused about Guidry's sources of revenue, and Guidry suggests he intended to deposit his proceeds from LDWF courses "through MD at Law." *Id.*

The court concluded that Haynes' excerpt did not merely explain Haynes' earlier comments about the method of reimbursement but rather introduced *new* concepts, namely GPP and LDWF. ROA.2093. The government's exhibit was then admitted and played twice, once during Guidry's examination, where he confirmed that the clip included discussions "about the kickback scheme," ROA.2143, and later during Agent Herman's testimony, ROA.2410.

[10] "CHS," short for "confidential human source," is Franques.

Haynes' proposed addition should have been admitted under Rule 106 because it corrects two misimpressions created by the government's excerpt. *See Herman*, 997 F.3d at 265.

*First*, the government's excerpt, with Franques' mention of "push[ing]" cases through, followed by Guidry's mention of "CBT" and their discussions about reimbursement, implies that Haynes was hoping to get reimbursed with revenue generated by PTI enrollments. The proposed addition clarifies that Haynes was hoping to get reimbursed for his investment in *other* businesses owned by Franques unconnected to the PTI program. In the addition, Haynes explicitly references "the other business." ROA.719.

*Second*, the government's excerpt creates the misimpression that Haynes reopened MD at Law as a repository for his reimbursements from the revenue on CBT courses through the PTI program. Haynes' addition disproves that alleged purpose, indicating instead that MD at Law was revived so that *Guidry* could receive money from other ventures. ROA.719.

Exclusion of this content prejudiced Haynes. Both misimpressions were central to the parties' theories of the case. Regarding the source of Haynes' reimbursement, Haynes sought to prove that Guidry was misleading him about the nature of his investments and the sources of his reimbursements.

ROA.1432, 1435, 1437, 1439, 2417 (cross-examination of Agent Herman, "Q: A lot of what Dusty told Gary was not true? A: Correct."); ROA.3096-97 (closing argument). In the proposed addition, Haynes' confusion about the reimbursements and Guidry's mention of three of his different ventures support the conclusion that Haynes was in the dark about the activities that would fund his reimbursements. ROA.719 ("GH: Yeah it's not, I guess it's not all loaned. Some of it's the investment of GPP. [OV] DG: So but look here's the here's the three tiers okay…."). This confusion in January 2022 undermines the government's theory that there was a bribery agreement in place starting in January 2021 whereby Haynes would trade official action on PTI cases for a defined portion of the revenue from the CBT courses.

Regarding the purpose of MD at Law, the government continually pointed to the company as a suspicious entity formed to conceal illegitimate activity—specifically, the kickbacks from the alleged PTI scheme. *See, e.g.*, ROA.2293. In closing argument, the government characterized Haynes' reviving of MD at Law as an overt act of the charged PTI-related conspiracy. ROA.3074-75. The proposed addition undermines that narrative by showing that Haynes revived MD at Law for another purpose. *See* ROA.3090 (defense closing argument urging this same conclusion).

The court's Rule 106 error therefore distorted the evidence before the jury on key, highly contested aspects of the alleged conspiracy and likely influenced the verdict.

### C. GX005-003

Lastly, the government introduced a lengthy recording piecing together several disjointed snippets of a conversation between Franques and Haynes. It includes, in relevant part, an exchange where Haynes apparently expresses that he was supposed to get a share of Guidry's proceeds from the CBT courses. ROA.810 (CHS: "[S]o I paid Dusty, now this was for all the CBT classes. I paid Dusty maybe $40,000 this month. GH: Damn. You see he's supposed to take that and put it, he's supposed to split that with me to pay me back. You know that?"). Franques responds, "no"—he was unaware that Haynes was supposed to receive a cut of the proceeds, *id.*, undermining the government's theory on the charged bribery scheme. The government did not call Franques to clarify.

Later in the government's excerpt, Haynes mentions his investment in LDWF, and Franques responds with agreement: "GH: But he told me the other day … He says, 'When the Wildlife and Fishery stuff hits, it's gonna be

comin in.' … CHS: Correct." ROA.819. The excerpt continues as they discuss coordinating reimbursements with Guidry. *See id.*

Haynes sought to add a statement the government had excised from the conversation, clarifying that he did not want his reimbursement coming from CBT course fees and instead intended to be repaid from Guidry's and Franques' other ventures: "You know? But that was the, that was my savings (laughs). You know. But in a way- when we sat down, I said 'Look, let's not fix it- let's not do it where… where I'm directly getting something from um CBT cause that's directly doing business with Don.' So he says 'I'll put you in, in Wildlife and Fisheries, um the GPP card processing,' I gave money for that too." ROA.817; *see* ROA.675-76. Franques responded, "I didn't know, I didn't know any of that." ROA.817. The district court rejected the addition, explaining that it did not satisfy Rule 106 and rather advanced Haynes' own theory of the case. ROA.2231. GX005-003 was then played during Agent Herman's examination. ROA.2404.

The district court abused its discretion in excluding Haynes' addition. As with GX001-015, the government's selected portions in GX005-003 create two misimpressions. *First*, Haynes' comment about receiving a portion of Guidry's CBT proceeds suggests that Haynes wanted to be directly

reimbursed by funds linked to the PTI program in exchange for enrolling more participants in Franques' CBT courses. ROA.810. The excised portion, however, makes clear that Haynes recognized he could not receive payments from a venture interfacing with the DA's Office and he instead wanted his reimbursement to come from Guidry's other revenue streams. ROA.817 ("[L]et's not fix it- let's not do it where… where I'm directly getting something from um CBT cause that's directly doing business with Don.").

*Second*, the government's excerpts suggest that Franques was aware of Haynes' investment in LDWF. Haynes mentions his investment, and Franques agrees. *See* ROA.819 ("GH: But he told me the other day … He says, 'When the Wildlife and Fishery stuff hits, it's gonna be comin in.' … CHS: Correct."). But Franques did not actually know about Haynes' investment in LDWF until Haynes told him earlier in the conversation, in a part excluded by the government. *See* ROA.187 ("I didn't know any of that."). Haynes' proposed addition provides that portion of the discussion. Although Haynes maintains that evidence about LDWF should not have been admitted at all, *see supra* pp.25-41, once the district court allowed such evidence, Haynes had a right to add ensure the LDWF evidence was not misleadingly presented.

The misimpressions created by GX005-003 unfairly advanced the government's case. As previously noted, the government struggled to prove a connection between Haynes' work on PTI and any money purportedly promised to Haynes. *See supra* pp.15-19. Haynes' contemporaneous statement that he did not want money coming from revenue from the CBT courses would have weakened the quid pro quo inference.

Moreover, the government's theory of the case relied on an alleged conspiracy among Haynes, Franques, and Guidry with respect to both the charged PTI conduct and the uncharged LDWF conduct. But the evidence was in conflict regarding the nature of either alleged agreement, with substantial evidence demonstrating that Guidry was not an honest broker between Haynes and Franques. *See supra* pp.15, 18. Franques' definitive statement that he "didn't know any[thing]" about Haynes' involvement in LDWF casts doubt on the existence of either conspiracy. His ignorance suggests there was no agreement among the three of them dating back to January 2021, and bolsters Haynes' defense that Guidry was conning everyone. ROA.3091. Although Franques expressed similar ignorance in other recorded statements admitted at trial, *see* ROA.3519 (GX002-001), this clip was selectively excerpted to give the opposite impression. Rule 106

provides for the corrective material to be "considered contemporaneously" with the out-of-context statement, not merely at some other point during the trial. *Herman*, 997 F.3d at 263 n.5 (quotation omitted). Franques' recorded statement in this clip, especially given his absence at trial, *see supra* p.15, was essential to Haynes' defense.

Any one of these Rule 106 errors, and certainly all of them combined, constitutes an abuse of discretion.

* * *

Even if the Court concludes that two or more of the evidentiary rulings constituted harmless error, Haynes' convictions should still be vacated and the case remanded for a new trial because the cumulative effect of the errors resulted in a fundamentally unfair trial. *See, e.g.*, *United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (en banc); *United States v. Houston*, 481 F. App'x 188, 194-96 (5th Cir. 2012) (per curiam). The prejudice stemming from the erroneous admission of evidence concerning the two uncharged bribery schemes was synergistic, with both sets of evidence wrongly tainting the jury's view of Haynes' character. The erroneous Rule 106 errors unfairly buttressed a weak case that the uncharged bribery evidence encouraged the jury to overlook. If the evidentiary rulings discussed herein had gone the

other way, it would have been "a very different trial." *United States v. Riddle*, 103 F.3d 423, 434-45 (5th Cir. 1997); *see also Houston*, 481 F. App'x at 195-96; *United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978).

## CONCLUSION

For the foregoing reasons, the Court should vacate the convictions and remand for a new trial.

Dated: May 29, 2026

Respectfully submitted,

/s/ *Amy Mason Saharia*
LISA S. BLATT
AMY MASON SAHARIA
*Counsel of Record*
PATRICK J. LOOBY
PATRICK C. HYNDS
ALEXANDRA NICKERSON
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.*
*Washington, DC 20024*
*(202) 434-5000*
*asaharia@wc.com*

*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed the Brief of Defendant-Appellant with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system. I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

Dated: May 29, 2026

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Brief of Defendant-Appellant contains 12,695 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365, Version 2604, in 14-point CenturyExpd BT.

Dated: May 29, 2026

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA